OPINION OF THE COURT
Phillip R. Rumsey, J.
*1023 Plaintiffs, two affiliated entities that operate a landfill gas recovery system at the Broome County Landfill pursuant to a “Landfill Gas Agreement” dated December 23, 1997, bring this action seeking, inter alia, a declaration that they have not defaulted on their obligations under that agreement.[1] Having received several letters from defendant County, asserting that plaintiffs have defaulted in numerous respects and threatening to terminate the lease agreement, plaintiffs now move for a Yellowstone injunction (see, First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630, 637 [1968]) to preserve their lease rights pending resolution of the parties’ respective claims by the court. In support of their motion, plaintiffs assert that they have satisfied the four criteria for such relief: the agreement in question is a commercial lease; plaintiffs have received a “notice of default” or “notice to cure” from defendant; this motion was brought prior to the expiration of the cure period (and hence, before the lease was terminated); and plaintiffs are prepared and able to cure the alleged defaults, without vacating the premises, if the court finds that a default did occur (see, Empire State Bldg. Assoc. v Trump Empire State Partners, 245 AD2d 225, 227-228 [1997]).
Defendant submits that injunctive relief should not be granted, because the agreement is not a “commercial lease” within the ambit of the Yellowstone doctrine; because the time to cure had already passed, and the agreement had therefore been terminated, before the motion was brought; or because public policy militates against granting such relief in this case, due to the risks to public health and safety that may result. These arguments are not persuasive.
It can hardly be disputed that the subject “Landfill Gas Agreement” (complaint, exhibit B) is a lease. Not only does the agreement refer to the parties as “lessor” and “lessee,” it also explicitly provides that “[t]he relationship between the parties hereto, except as otherwise stated, shall be that of landlord and tenant alone, and nothing herein shall create . . . any relationship other than that of landlord and tenant” (agreement art XIX). Aside from this explicit characterization, which is certainly relevant in determining whether the parties intended to create a lease (see, Nextel of N.Y. v Time Mgt. Corp., 297 *1024 AD2d 282, 282-283 [2002]), the agreement bears numerous other hallmarks of a lease. Perhaps most importantly, it gives plaintiff Broome Landfill Gas Associates, HP, the “lessee,” the right to “construct . . . structures as may be necessary to prevent access to and provide security for its gas wells and gas and electricity generating facilities” (agreement art II [D] [emphasis added]), and the right to “quiet enjoyment ... of its rights under this Lease” (id., art III [B]; see, Nextel at 283).
In addition, defendant concedes that the agreement includes provisions whereby the County agreed to lease a one-third-acre parcel to plaintiff (affidavit of David M. Donoghue, dated Sept. 23, 2005, 1i 23 [“the County does not lease any real property to (plaintiff) except for a one-third of an acre parcel” (emphasis added)]; defendant’s mem of law at 4 [“the County leased a one-third acre parcel of the 160-acre Landfill to (plaintiff)”]). This, too, is similar to the agreement at issue in Nextel, where the fact that plaintiff was granted exclusive occupancy of 200 square feet of interior space, together with the nonexclusive right to place telephone antennae on defendant’s roof, was viewed as relevant in determining that the overall arrangement was a “lease” rather than merely a “license.” The mere fact that the agreement also establishes other rights and obligations, or that the instant dispute involves those other aspects of the agreement, does not transform it into something other than a lease for these purposes.
Having found that the agreement is, in fact, a “lease,” the court is next confronted with the question of whether it is a “commercial lease” as such term is used in determining a tenant’s entitlement to a Yellowstone injunction. Neither party has cited, and the court has not located, any case in which such relief was granted (or denied) to a lessee of gas, oil or mineral rights. Defendant, citing the unique nature of such contracts, argues that it would be an unwarranted expansion of the Yellowstone doctrine to grant injunctive relief in such a case, where there is no risk that the tenant will lose “incalculable goodwill associated with its business location” (defendant’s mem of law at 15) if the lease is terminated. Courts have not hesitated, however, to grant injunctive relief to prevent the loss of a valuable leasehold interest by a tenant that has made a substantial investment in the subject property (see, WPA/Partners v Port Imperial Ferry Corp., 307 AD2d 234, 236 [2003]), even where, as here, the lease does not involve a typical “storefront” operation, or any assertion that goodwill will be lost if the lease is *1025 terminated (see, Marathon Outdoor v Patent Constr. Sys. Div. of Harsco Corp., 306 AD2d 254 [2003] [lease of land for placement of advertising billboards]; Nextel, supra [lease of rights to place cellular telephone antennae and equipment on roof and in building]). A key factor, in determining whether Yellowstone relief is available, is whether the tenant is at risk of losing a “valuable leasehold interest” if the right to cure is not preserved, pending resolution of a dispute over whether a default has occurred (see, Marathon Outdoor at 255; Fratto v Red Barn Farmers Mkt. Corp., 144 AD2d 635, 637 [1988]).
Those factors weigh heavily in favor of applying the Yellowstone standards in this case. Plaintiffs have invested substantial sums to construct and operate a complex landfill gas collection and power generation system on, and under the surface of, the landfill.[2] The property interest at stake is essentially unique and irreplaceable, and certainly quite valuable. It is precisely because the law “disfavors forfeiture” of such an interest (WPA/ Partners at 237) that an injunction will be granted, to preserve it, upon “far less than the normal showing required for preliminary injunctive relief” (Heavy Cream v Kurtz, 146 AD2d 672, 673 [1989]). Neither the nature of the underlying agreement, nor of the property interest involved, provide any reason to refuse such relief here.
Defendant’s remaining contentions do not require extended discussion. The assertion that the cure period had already expired when this motion was brought is belied by the letter of defendant’s counsel, dated August 5, 2005 — just four days before the present motion was brought — notifying plaintiff that the time to cure the defaults is “near an end” and that plaintiff is “facing termination” (Donoghue affidavit, exhibit I). Although counsel also stated, in that letter, that the time within which plaintiff was required to “commence” correction of defaults relating to environmental regulations had “already passed” (id.), it has not been definitively established, at this juncture, that any of the alleged defaults actually comes within the scope of *1026 that “immediate commencement” requirement (agreement art XII [F]).
More importantly, however, the agreement also specifies that its termination is to be effected “by providing the affected party with written notice,” specifying the reason for termination (agreement art VIII [C]). By letter dated July 15, 2005, defendant’s counsel informed plaintiff that the County would “treat the Lease as terminated” at the close of business on July 22, 2005, unless plaintiff notified defendant prior to that time of its intention to cure the claimed defaults (affidavit of James M. Malandrines, dated Aug. 5, 2005, exhibit E).[3] Such notice was provided by plaintiffs attorney, whose letter of July 21, 2005 expressly states that plaintiff “intends to cure” any defaults that are found to be valid after further investigation, and that plaintiff would further inform defendant of the actions it would be taking “regarding appropriate cures for the County’s listed ‘defaults’ ” by early August (id. exhibit F). Thus, there is no basis in the record for a finding that the lease had already been terminated when the motion was brought.
Lastly, the court is not persuaded that the issuance of a Yellowstone injunction, preserving the status quo, would pose an unacceptable risk of harm to the health or safety of county residents. Interestingly, in recounting the history of the parties’ relationship, defendant’s expert notes that the County has, over the “past several years . . . exhibited extraordinary patience with [plaintiff],” attempting “[t]ime and again” to work with plaintiff to resolve the present issues, “without taking the formal step of declaring [plaintiff] in default” (Donoghue affidavit K 48). It appears that many of the circumstances that have prompted defendant’s current claims of potential harm have actually been in existence for quite some time, yet the County evidently did not feel the situation was so dire, during that time, to warrant immediate termination of the lease. Significantly absent from defendant’s papers is any indication that the *1027 Department of Environmental Conservation has identified any area of concern in this regard (see, affidavit of Paul Ballard, dated Oct. 3, 2005, 11 5; affidavit of Ray L. Standish, dated Sept. 29, 2005, U 9; affidavit of John G. Powers, Esq., dated Oct. 3, 2005, 1i 35; affidavit of John Osgood, dated Oct. 3, 2005, 1115).
Moreover, with regard to the specific incidents cited by defendant as indicative of the type of dangers posed by plaintiffs alleged breaches, it has not been definitively established that any of those occurrences were caused by plaintiffs negligence or other fault (see, e.g., Osgood affidavit 11 32), and it appears that in each case, plaintiffs personnel took prompt remedial action, thus obviating any potential threat to the public (see, e.g., Ballard affidavit 1ÍU 6, 9, 10; Standish affidavit 1110; Osgood affidavit 11 55). In sum, there is no convincing proof that public health or safety would be threatened by continuance of the parties’ landlord/tenant relationship until the issues underlying this lawsuit can be resolved.
The motion is therefore granted, and plaintiffs time to cure any lease default is hereby stayed until further order. Moreover, in light of the substantial value of the improvements installed upon the premises by plaintiff, which provide ample security for any award of costs or damages in defendants’ favor if it is determined that this injunction should not have issued, there is no need for plaintiff to post an undertaking (see, WPA/Partners at 237; Kuo Po Trading Co. v Tsung Tsin Assn., 273 AD2d 111 [2000]).

. The complaint also seeks damages for defendant’s alleged breach of the express terms of the agreement, and of the implied covenants of good faith and fair dealing, and a declaration that defendant is obliged to reimburse plaintiffs for future costs stemming from any expansion or alteration of the landfill.

. The system is comprised of over 50 gas extraction wells, 24 inches in diameter and ranging in depth from 40 to 60 feet, at various locations throughout three sections of the landfill; a system -of collection pipes (“laterals” and “headers”); and a centrally located blower station and generating facility (complaint UK 23-25). The gas created by decomposition of garbage in the landfill is drawn by vacuum (created by the blower system) from the wells into the collection pipes, and ultimately to the central facility, where it is compressed and then used as fuel to generate electricity, which plaintiffs then sell to a local power company (id. 1¡H 24-26).

. Although a letter of June 27, 2005, from defendant’s Deputy Commissioner of Public Works, stated that “the Lease is therefore terminated upon receipt of this Notice by [plaintiff], subject to any applicable cure period,” it is clear that defendant did not consider the lease to have been terminated prior to July 15, 2005, when the next letter was sent, giving plaintiff a specific deadline by which to communicate its intention to cure, or have the lease deemed terminated. Implicit in this “ultimatum” is its converse — that if plaintiff meets the condition, the lease would not be terminated on July 22, 2005 — as well as an assumption that the lease had not been terminated, as a result of the June 27, 2005 letter.